Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
samuel@briansking.com
tera@briansking.com

Attorneys for Plaintiffs

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| A.H., and K.H.,<br><br>            Plaintiffs,<br><br>vs.<br><br>UNITED HEALTHCARE INSURANCE COMPANY, UNITED BEHAVIORAL HEALTH, and the DELTA PILOTS MEDICAL PLAN (DPMP) INCLUDING A NETWORK OPTION AND OUT-OF-AREA (OOA) OPTION<br><br>            Defendants. | COMPLAINT<br><br><br>Case No. 1:22-cv-00081 - DBP |

Plaintiffs A.H. and K.H. ("K.H."), through their undersigned counsel, complain and allege against Defendants, United Healthcare Insurance Company ("UHC"), United Behavioral Health ("UBH") (collectively "United") and the Delta Pilots Medical Plan (DPMP) Including a Network Option and Out-of-Area (OOA) Option ("the Plan") (collectively "Defendants") as follows:

//

1

## PARTIES, JURISDICTION AND VENUE

1. A.H. and K.H. are natural persons residing in Pinellas County, Florida. A.H. is K.H.'s father.

2. United is an insurance company headquartered in Hennepin County, Minnesota and was the insurer and claims administrator, as well as the fiduciary under ERISA for the Plan during the treatment at issue in this case.

3. The Plan is a self-funded employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). A.H. was a participant in the Plan and K.H. was a beneficiary of the Plan at all relevant times. A.H. and K.H. continue to be participants and beneficiaries of the Plan.

4. K.H. received medical care and treatment at Uinta Academy ("Uinta") from October 22, 2019, to December 27, 2020. Uinta is a licensed treatment facility located in Cache County, Utah, which provides sub-acute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems.

5. UHC, acting in its own capacity or through its subsidiary and affiliate United Behavioral Health ("UBH"), denied claims for payment of K.H.'s medical expenses in connection with her treatment at Uinta.

6. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

7. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, because United does business in Utah, has a claims processing facility in Salt Lake City where the appeals in this case were sent, and the Plan has many participants and beneficiaries living in Utah.

8. In addition, A.H. has been informed and reasonably believes that litigating the case outside Utah will likely lead to substantially increased litigation costs for which he will be responsible to pay, which would not be incurred if venue of the case remains in Utah. Finally, in light of the sensitive nature of the medical treatment at issue, it is the Plaintiffs' desire that the case be resolved in the State of Utah where it is more likely their privacy will be preserved.

9. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### K.H.'s Developmental History and Medical Background

10. K.H. was born by emergency cesarian section due to a dangerous pregnancy and induced hypertension, leading to pre-eclampsia.

11. K.H. swallowed fluid upon delivery and spent several days in the NICU.

12. K.H. would cry inconsolably for hours every day as an infant and suffered from acute acid reflux.

13. K.H. developed quickly, despite her pre-mature birth. She had to sleep in a toddler bed before her first birthday because she could already remove herself from her crib and it was unsafe.

14. As a child, K.H. was high energy, imaginative, outgoing, and strong willed.

15. K.H. seemed unaware of how her peers would perceive her and was very bossy as a child. She had bouts of defiance against teachers and was sometimes aggressive with other children if she did not get her way.

16. K.H. was diagnosed with ADHD and Oppositional Defiant Disorder at the age of five.

17. K.H.'s parents brought her to a play therapist and eventually tried medication to help K. with her mental health diagnosis.

18. K.H. did not react well to her medications. At best, some medications would work for a short period of time and then become ineffective.

19. As K.H. grew older, her teachers would constantly reprimand her for not following the rules and K.H. started to lose her self-esteem at a young age.

20. K. could work well with a younger friend who she would lead, or with an older friend who she could follow, but K.H. had a hard time making friends with her peers as she did not handle undefined roles well.

21. By the time K.H. was seven, her parents moved her from Dallas to Houston so that she could be closer to her biological father's family. Being close to this extended family gave K.H. the increased structure and support that she needed.

22. A few weeks after K.H.'s tenth birthday, K.H.'s biological father died in a car accident while on a work trip.

23. K.H. and her mother entered a grief program and K.H. started to see a private grief counselor bi-weekly.

24. K.H.'s mother had to start working after the loss of K.H.'s biological father which led to K.H,'s mother needing to hire a nanny due to the increased work travel.

25. K.H. and her mother found a nanny who worked well, and after some time, that nanny quit unexpectedly.

26. About this same time, K.H.'s grandparents stopped returning K.H.'s calls and they phased K.H. out of their lives.

27. When K.H. was twelve, K.H.'s mother met A.H. and they eventually moved to Florida and got married. K.H. asked A.H. to adopt her, and K.H. was excited to have a sister and a new father figure.

28. A.H.'s ex-wife phased A.H.'s daughter out of K.H.'s life and K.H. quickly lost the sister she was excited to have.

29. Between the ages of ten and twelve, K.H.'s grades started to slip dramatically, and she started showing signs of depression.

30. K.H.'s parents started to find indications of self-harm such as cut marks on her arms and legs around this time.

31. K.H. started to steal from her friends and family and would seem overly remorseful after she was caught.

32. In 2016 and 2017, K.H.'s parents had her reevaluated and K.H. was then diagnosed with Attention Deficit Hyperactivity Disorder – Combined Type, Disruptive Mood Dysregulation Disorder, Unspecified Depressive Disorder, and Oppositional Defiant Disorder.

33. K.H.'s parents worked with the school district to get a 504 plan in place but eventually, it became evident that K.H. needed a more structured environment.

34. K.H.'s parents enrolled her into the Admiral Farragut Academy and they all moved across the state to be with K.H. in this new school.

35. K.H.'s impulsive behaviors caused her to get in trouble often at her new school and she was heavily bullied for the next year and a half.

36. During this time, K.H. started expressing suicidal ideation, succumbed to urges of self-harm and dealt with disordered eating. K.H. also started to engage in promiscuous behaviors with boys to try and seek approval.

37. During these years, K.H. continued to see therapists and psychologists to try and help manage her mental health conditions.

38. In 2018, an old friend came to stay with K.H. and her parents. K.H. confided in her mother that the friend's son was sexually inappropriate with her when they were between five and ten years old, on several occasions.

39. In June of 2019, K.H. was admitted to an intensive outpatient therapy program which she attended daily. At this program, she convinced the treating providers that her only issue was an eating disorder and a week before she was discharged, they changed her medications.

40. After K.H. was discharged from the intensive outpatient therapy program, she sunk into a deep depression and was caught doing drugs, sneaking boys into the house, and cutting her arms significantly.

41. K.H. cut her arms so badly one day that her mother had to take her to the hospital. K.H. was voluntarily admitted into an intensive inpatient hospital program for five days.

42. After she was discharged from her inpatient program, she was referred to La Amistad, a residential treatment center.

43. While K.H. was at La Amistad, she had admitted that she was taking drugs daily, she had been raped, she was being abused, and she had no control over her life.

44. While K.H. was at La Amistad, a family friend and her grandmother passed away.

45. When K.H. was discharged from La Amistad, she was diagnosed with Borderline Personality Disorder, Post Traumatic Stress Disorder, Generalized Anxiety Disorder, Social Anxiety Disorder, Anorexia Nervosa, and various Substance Abuse Disorders.

46. K.H.'s parents found Uinta to be a good fit for K.H. as they were able to handle all of K.H.'s diagnoses while also helping her finish high school, despite her already turning eighteen years old.

**Uinta**

47. K.H. was admitted to Uinta on October 22, 2019.

48. In a letter dated October 30, 2019, UBH denied K.H.'s treatment at Uinta stating in part,

> [UBH] is responsible for making benefit coverage determinations for mental health and substance use disorder services that are provided to UBH members.
> …
> I have reviewed your treatment plan that was submitted by Unita [sic] Academy, and I have determined that coverage is not available under your benefit plan for the requested services of Residential.
> You were admitted at a mental health residential treatment program. This review is for a request for benefit coverage for this treatment effective 10/22/2019 and thereafter.
> After talking with your provider, it is noted that the facility/program is utilizing an unproven/experimental treatment modality, which is excluded and not a covered benefit per your benefit plan document and Optum review of this care.
> You cannot be covered for services or treatments that are unproven or experimental, as these are non-evidence-based care and excluded from your benefit. Thus, authorization is unbillable for this facility for medical oversight.
> In addition, based on Optum Level of Care Guidelines, there is no clinical information to support the need for half-day intensive outpatient care and support. You are medically stable. You are not reported to have any psychiatric issues that would prevent you from continuing treatment outside a half-day intensive outpatient monitored setting. You have been involved in treatment and you have had coping skills education. You can continue your recovery in a less intensive setting. At this point, continued services do not require the frequency and intensity of half-day intensive outpatient monitoring.
> …
> You could continue care with outpatient providers, utilizing an evidence based treatment modality.

49. On March 13, 2020, A.H. submitted an appeal, on behalf of K.H., regarding the denial of K.H.'s treatment at Uinta.

50. In A.H.'s level one appeal, he states in part,

> This denial rationale is borderline nonsensical, given the fact that United acknowledges that [K.H.]'s level of care at [Uinta] is residential treatment, but then states that she did not require the *intensive outpatient* level of care. These two levels of care are two *completely* different levels of mental health care, and as such it appears that we have not been provided with a full and thorough review.
> …
> We also disagree with the United's [sic] statement that [Uinta] is utilizing an unproven/experimental treatment modality, as residential treatment is a highly established and proven treatment setting for patients who require intensive, inpatient mental health treatment.
> …
> To help demonstrate that you are providing a full, fair, and thorough review of this appeal, please assign a reviewer who is board certified in adolescent psychiatry and who has experience treating adolescents and young adults with attention-deficit hyperactivity disorder (ADHD), post-traumatic stress disorder (PTSD), generalized anxiety disorder, social phobia, bipolar disorder, body dysmorphic disorder, alcohol dependence, cannabis dependence, opioid dependence, and other high risk behaviors in an intermediate residential setting.
> …
> Accordingly, we have the right to a response from you that is clear, specifically states the reasons for determination, references the plan language on which your decision is based, and explains what other information we could provide to you in order to perfect [K.H.]'s claim.
> …
> However, if you do not pay this claim based on the information we have presented in this appeal, we ask that you provide us with the specific reasons for your determination along with any corresponding supporting evidence. We would also like to request that you send us a copy of any administrative services agreements that exist, any clinical guidelines or medical necessity criteria utilized to evaluate the claim, any mental health, substance use disorder, skilled nursing facility, inpatient rehabilitation, or hospice medical necessity criteria used to administer our plan, and any reports or opinions provided to you from any physician or other processional about this claim.[1]

51. A.H. also explained why UBH's statement that Uinta provides experimental treatment was unfounded, stating:

---

[1] Emphasis in original

> …based on this rationale we find it difficult to believe that any representative from United spoke with [Uinta] staff. [Uinta] is licensed by the state of Utah to provide Mental Health/Residential Treatment For Youth Female Clients Ages 12 to 16. In order to receive this license, [Uinta] meets the state of Utah's strict regulations regarding the operation of Residential Treatment Programs. In your response to this appeal, please *explicitly* confirm that you have reviewed the attached license…[2]

52. A.H. went on to explain that K.H.'s treatment at Uinta met the definition for a residential treatment center in the insurance policy,

> …[Uinta] meets our plan's definition of a residential treatment program. While admitted to [Uinta], [K.] receives 24-hour supervision, structure, and treatment. Her program is intended to treat her multiple mental health disorders in a reasonable period of time. …she admitted for the treatment of her mental health disorders that were causing her to suffer from severe functional impairment across all areas of her life…

53. Lastly, A.H. explained how UBH and UHC appeared to be violating the Mental Health Parity and Addiction Equity Act ("MHPAEA") stating in part,

> According to your denial letter, the intermediate behavioral health services that [K.H.] is receiving at [Uinta] are not a covered benefit under our plan. As [Uinta] is licensed by the state of Utah as a residential treatment center, it appears that United may be discriminating against [Uinta] based on provider specialty or some unnamed criteria that limits the scope of benefits for mental health care, as we cannot imagine that United would deny coverage for a similarly covered non-network skilled nursing facility.

54. In a letter dated April 13, 2020, UBH upheld the denial of K.H.'s treatment at Uinta stating in part,

> [UBH] is responsible for making benefit coverage determinations for mental health and substance use disorder services that are provided to UBH members.
> …
> As requested, I have completed an urgent appeal/grievance review on 04/10/2020 11:02 AM EDT on a request we received on 03/25/2020.
> This review typically involves a telephone conversation with your provider. However, UBH attempts to reach your provider by phone were unsuccessful. Therefore, the review was based on the information available in your record and any additional information you may have submitted.

---

[2] Emphasis in original

9

> After fully investigating the substance of the appeal/grievance, including all aspects of clinical care involved in this treatment episode, I have determined that benefit coverage is not available for the following reason(s):
> You were admitted at a mental health residential treatment program. This appeal review is for a request for benefit coverage for this treatment effective 10/22/2019 and thereafter.
> After reviewing the case notes, medical records and appeals materials, the patient did not require 24 hour care.
> You are medically stable. You have no evidence of substance use withdrawal. You do not have any psychiatric issues that would prevent you from continuing treatment outside a residential treatment center setting. You have been involved in residential treatment prior to this admission and you have learned many coping skills education. You can continue your recovery in a less intensive setting. At this point, continued services do not require the frequency and intensity of full day residential monitoring. Furthermore, you have not been seen on a regular basis by a psychiatrist which is an OPTUM requirement for residential care. The facility also has several treatment approaches which are not evidence based. Also, the medication regime noted is not consisted [sic] with the diagnoses provided in the medical records.
> …
> You could continue care with IOP and/or outpatient providers, utilizing an evidence-based treatment modality.

55. On June 4, 2020, A.H., again appealed the denial of K.H.'s treatment at Uinta from her admission on October 22, 2019, through discharge.

56. The June 4, 2020, appeal letter itself was 56-pages long and included hundreds of pages of exhibits which encompassed letters of medical necessity, the entirety of the level one appeal, multiple psychological assessments, medical records from several facilities prior to K.H.'s treatment at Uinta and over 400 pages of medical records from Uinta.

57. A.H.'s explained the numerous administrative errors made by United. First, United continued to send letters to A.H.'s incorrect address. United had continuously named Uinta improperly, often referring to it as "Unita Academy" and "Unity Academy RTC."

58. Additionally, United processed A.H.'s level one appeal as an urgent appeal/grievance even though it was submitted several months after K. was admitted to Uinta and no

urgent appeal was requested. Also, A.H.'s healthcare advocate spoke with UHC specifically to request that it *not* be processed as an urgent appeal.

59. A.H. explained again how United had committed MHPAEA and ERISA violations, and requested that United provide him with a full and through review of his appeal, and if it maintained the denial, that it provide him with a full explanation.

60. In a letter dated July 9, 2020, UBH upheld the denial of K.H.'s treatment at Uinta, stating in part,

> An appeal request was received for 10 units of treatment in a mental health residential setting from 10/22/19 through 10/31/19. After reviewing the case notes and the submitted appeal information, there is insufficient clinical information provided to support the medical necessity for treatment in a mental health residential setting. Limited medical records for the appealed dates of service were provided. No initial psychiatric evaluation nor documentation of regularly-scheduled appointments with the facility psychiatrist were provided. Therefore, it does not appear that this program met the service intensity expected at the mental health residential level of care.
> In addition, authorization at this facility is not available due to service components not consistent with level of care guidelines.
> …
> I have determined that benefits coverage is not available for your admission to Unita [sic] Academy for the following date(s) of service: 10/22/2019 through 10/31/2019.

61. Despite A.H. submitting two appeals for all dates of service of K.H.'s treatment at Uinta, United did not address any date past October 31, 2019, in their level two denial.

62. The July 9, 2020, letter from UBH continued to commit the same administrative errors it had made in the past and barely addressed any of the arguments brought up in A.H.'s level two appeal.

63. United did not provide A.H. with a full and fair review of his appeal.

64. On May 14, 2021, A.H. submitted a member response to the adverse benefit determination letter to clarify the issues with UBH's processing of K.H.'s Uinta claims.

11

65. The May 14, 2021, letter explained that Uinta had been improperly "flagged" in UHC's system so that any services provided by the facility would be denied, regardless of the medical necessity of the treatment in question and regardless of the fact that the facility satisfied all of the requirements for a residential treatment center listed in the insurance policy.

66. A.H. requested a response to this letter, but as of the time of filing of this Complaint, A.H. has not received one.

67. The Plaintiffs exhausted their pre-litigation appeal obligations under the terms of the Plan and ERISA.

68. The denial of benefits for K.H.'s treatment was a breach of contract and caused A.H. to incur medical expenses that should have been paid by the Plan in an amount totaling over $200,000.

69. United failed to produce a copy of the plan documents including any medical necessity criteria for mental health and substance use disorder treatment and for skilled nursing or rehabilitation facilities despite A.H.'s multiple requests.

## FIRST CAUSE OF ACTION

**(Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))**

70. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as United, acting as agent of the Plan, to "discharge [its] duties in respect to claims processing solely in the interests of the participants and beneficiaries" of the Plan. 29 U.S.C. §1104(a)(1).

//

71. United and the Plan failed to provide coverage for K.H.'s treatment in violation of the express terms of the Plan which promise benefits to employees and their dependents for medically necessary treatment of mental health and substance use disorders.

72. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with the Plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

73. The denial letters produced by United do little to elucidate whether United conducted a meaningful analysis of the Plaintiffs' appeals or whether it provided them with the "full and fair review" to which they are entitled. United failed to substantively respond to the issues presented in A.H.'s appeals and did not meaningfully address the arguments or concerns that the Plaintiffs raised during the appeals process.

74. In fact, United's denial letters rely on formulaic recitations and do not address the arguments raised by A.H. in any capacity.

75. United and the agents of the Plan breached their fiduciary duties to K.H. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in K.H.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, to produce copies of relevant documents and information to claimants upon request, and to provide a full and fair review of K.H.'s claims.

76. The actions of United and the Plan in failing to provide coverage for K.H.'s medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

//

## SECOND CAUSE OF ACTION

### (Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))

77. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA. The obligation to comply with both ERISA and MHPAEA is part of United's fiduciary duties.

78. Generally speaking, MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

79. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and also makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

80. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity; refusal to pay for higher-cost treatment until it can be shown that a lower-cost treatment is not effective; and restrictions based on geographic location, facility type, provider specialty, or other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A), (F), and (H).

81. The medical necessity criteria used by United for the intermediate level mental health treatment benefits at issue in this case are more stringent or restrictive than the medical

necessity criteria the Plan applies to analogous intermediate levels of medical or surgical benefits.

82. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for K.H.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities.

83. For none of these types of treatment does United exclude or restrict coverage of medical/surgical conditions by imposing restrictions such as an acute care requirement for a sub-acute level of care. To do so, would violate not only the terms of the insurance contract, but also generally accepted standards of medical practice.

84. When United and the Plan receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice.

85. United and the Plan evaluated K.H.'s mental health claims using medical necessity criteria that deviate from generally accepted standards of medical practice. This process resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

86. Although Uinta is a licensed and accredited residential treatment facility which satisfies the requirements in the Plan documents for coverage yet it is "flagged" by United as a facility for which coverage is automatically denied.

87. United does not similarly "flag" analogous medical and surgical facilities for denial if they are licensed and meet the requirements for coverage outlined in the Plan documents.

//

88. Additionally, Defendants appeared to evaluate Uinta incorrectly as a "half-day intensive outpatient monitored setting" as opposed to a sub-acute residential treatment center, also leading to a near universal denial of benefits.

89. As another example of the Plan's improper application of its criteria to evaluate the treatment K.H. received, the Defendants relied on assertions such as "[y]ou are medically stable" and "[y]ou have no evidence of substance use withdrawal" as a justification to deny treatment.

90. In fact, being medically stable and not going through substance use withdrawal serves as an indicator, rather than a contra-indicator, of the medical necessity of treatment in a non-acute residential setting.

91. In this manner, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and United, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

92. United and the Plan did not produce the documents the Plaintiffs requested to evaluate medical necessity and MHPAEA compliance, nor did they address in any substantive capacity the Plaintiffs' allegations that United and the Plan were not in compliance with MHPAEA.

93. The violations of MHPAEA by United and the Plan are breaches of fiduciary duty and give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

    (a) A declaration that the actions of the Defendants violate MHPAEA;

    (b) An injunction ordering the Defendants to cease violating MHPAEA and requiring compliance with the statute;

    (c) An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

    (d) An order requiring disgorgement of funds obtained by or retained by the Defendants because of their violations of MHPAEA;

    (e) An order requiring an accounting by the Defendants of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan because of the Defendants' violations of MHPAEA;

    (f) An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiffs as make-whole relief for their loss;

    (g) An order equitably estopping the Defendants from denying the Plaintiffs' claims in violation of MHPAEA; and

    (h) An order providing restitution from the Defendants to the Plaintiffs for their loss arising out of the Defendants' violation of MHPAEA.

94. In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiffs seek relief as follows:

1. Judgment in the total amount that is owed for K.H.'s medically necessary treatment at Uinta and under the terms of the Plan, plus pre- and post-judgment interest to the date of payment;

2. Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiffs' Second Cause of Action;

3. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

4. For such further relief as the Court deems just and proper.

DATED this 28th day of June, 2022.

By    s/ Brian S. King
      Brian S. King
      Attorney for Plaintiffs

County of Plaintiffs' Residence:
Pinellas County, Florida